J-S02044-24

2024 PA Super 44

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DERRICK FLOYD | : | No. 525 EDA 2023 |

Appeal from the Order Entered January 11, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002630-2022

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED MARCH 13, 2024**

The Commonwealth/Appellant appeals from the order entered January 11, 2023, in the Court of Common Pleas of Philadelphia County granting a suppression motion in favor of Defendant/Appellee, Derrick Floyd. After a careful review, we reverse.

The relevant facts and procedural history are as follows: On September 9, 2021, Philadelphia Police Officer Gary Outterbridge, who is assigned to the Narcotics Strike Force, was working in his official capacity on a surveillance operation for the sale of illegal narcotics on the 4500 block of Lancaster Ave. in the city of Philadelphia. N.T. at 6. Establishments on the street include liquor stores, Chinese restaurants, and bodegas, and the street is located in a business district where the sale of narcotics is frequent. N.T. at 17. He was in his marked police vehicle in full uniform. N.T. at 7. At approximately 5:42 PM,

_____

[*] Former Justice specially assigned to the Superior Court.

he observed a black male, later identified as Defendant, Derrick Floyd, engage in a brief conversation with an unknown black female. N.T. at 8. The officer was using binoculars and was approximately thirty feet away. N.T. at 19. The unknown female handed Defendant United States currency. N.T. at 8. Defendant walked around to the passenger side of a white Dodge Ram pickup truck with a Pennsylvania plate with the last four digits 6336. Defendant entered the passenger side of his pickup truck and briefly sat in his vehicle. N.T. at 8. When Defendant emerged from his vehicle, he handed the unknown female small objects. N.T. at 9. Another team on the strike force was sent to apprehend the female, but she was lost in the area. About four minutes later, at approximately 5:46 PM, Defendant engaged in a conversation with the second black female, later identified as Myra Buchanan. Ms. Buchanan handed Defendant an undetermined amount of U.S. currency. In the same manner as before, he entered the passenger seat of his white Dodge Ram truck, returned into view, and handed Ms. Buchanan small objects. N.T. at 9. Ms. Buchanan was stopped by another officer who recovered two green flip top containers containing crack cocaine. N.T. at 9-10.

About four minutes later, at 5:50 PM, Defendant entered the driver's seat of his truck and an officer stopped his vehicle. On Defendant's person, $36 of United States currency was recovered. N.T. at 10. The officer who effectuated the arrest handed the key to Defendant's Dodge Ram to Officer Anthony Woltman, another member of the strike force assigned to the operation on 4500 Lancaster Ave. N.T. at 27. Officer Woltman placed the

truck on a Philadelphia property receipt, entered the vehicle, and transported it to 4298 Macalester Street, a secure police facility, pending the approval of a search warrant. N.T. at 24.

At 9:27 PM, Officer Outterbridge served a warrant on Defendant's vehicle and observed while it was searched by Officer Wright and Officer Zukauskas at the secure police facility, 4298 Macalester Street. N.T. at 11. Recovered from the vehicle was $725 U.S. currency, a black .45 caliber handgun with an obliterated serial number that was loaded with ten live rounds, an Arizona tea can with a false bottom containing two and a half grams of bulk cocaine and seventy-two green flip top containers containing crack cocaine, thirty-three clear flip top containers containing crack cocaine, and two clear jars of marijuana. N.T. at 12-14. All of these items were recorded on a Philadelphia property receipt. N.T. at 14.

On November 30, 2022, a suppression hearing was held at which Officer Outterbridge and Officer Woltman testified to the above facts, and Ms. Buchanan testified on behalf of Defendant. She stated that on September 9, 2021, she interacted with Defendant on Lancaster Ave. and briefly spoke with him because he is a family friend. N.T. at 29-30. She admitted that she was stopped by police several minutes later and was found to have crack cocaine but denied having purchased it from Defendant during their interaction. N.T. at 28-29. At the conclusion of the suppression hearing, the trial court held the matter under advisement and directed the parties to file briefs in support of their arguments. On January 11, 2023, the trial court granted Defendant's

motion to suppress the evidence recovered from his vehicle because of Officer Woltman's warrantless entry of the vehicle. The Commonwealth timely appealed. Tr. Ct. Op. at 1.

The Commonwealth raises one question for our review: "Did the lower court err by suppressing evidence seized pursuant to a valid search warrant from a car on the ground that, following defendant's lawful arrest, an officer drove the car from a public street to a police lot pending approval of the warrant?" Appellant's Br. at 3.

Our standard of review in addressing a challenge to the suppression court's order granting a suppression motion is well settled:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>     Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain de novo review over the suppression court's legal conclusions.

*Commonwealth v. Korn*, 139 A.3d 249, 252-53 (Pa. Super. 2016), appeal denied, 159 A.3d 933 (2016). Here, Defendant was arrested without a warrant.

This Court has previously noted:

> It is axiomatic that the validity of a warrantless arrest is determined by considering "whether, at the moment the arrest

- 4 -

was made, the officer had probable cause to make it," **Beck v. Ohio**, 379 U.S. 89, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142, (1964), and the person arrested is believed to be the guilty party.

**Commonwealth v. Mallory**, 614 A.2d 1174, 1176 (Pa. Super. 1992), appeal denied, 621 A.2d 578 (Pa. 1993). Probable cause to effectuate a warrantless arrest exists when:

> "the facts and circumstances within the knowledge of the arresting officer are reasonably trustworthy and sufficient to justify a person of reasonable caution in believing that the arrestee has committed an offense." **Commonwealth v. Romero**, 449 Pa. Super. 194, 673 A.2d 374, 376 (Pa. Super. 1996). In making this determination, this Court has held that "[p]robable cause for a warrantless arrest requires only the probability, and not a prima facie showing, of criminal activity." **Id.** at 377 (citing **Commonwealth v. Quiles**, 422 Pa. Super. 153, 619 A.2d 291, 298 (Pa. Super. 1993) (en banc)).

**Commonwealth v. Rickabaugh**, 706 A.2d 826, 835-36 (Pa. Super. 1997) (some formatting added).

Here, Defendant was arrested without a warrant after the officers obtained probable cause through their observations to believe he was engaged in narcotic transactions, or a violation of 35 P.S. § 780-113. Instantly, Defendant argues that his arrest was not supported by probable cause because the officers failed to establish a nexus between their extensive experience and their observations. Appellee's Br. at 12-13. Defendant cites **Commonwealth v. Dunlap**, 941 A.2d 671 (Pa. 2007) and **Commonwealth v. Thompson**, 985 A.2d 928 (Pa. 2009) for the proposition that the Commonwealth must establish a nexus between an officer's experience and

the specific circumstances of the incident. Appellee's Br. at 13. However, this Court has noted:

> First, **Thompson** involved a single hand-to-hand transaction. It was under those limited circumstances (as was also the case in **Dunlap**) that the value of police experience became critical to the probable cause determination. Because the officer's observation of the lone transaction, by itself, did not create probable cause, the police officer's experience was necessary to determine whether probable cause existed. Per **Thompson**, that experience has value only if the officer can demonstrate a nexus between the experience and the observed behavior. However, the necessity of establishing that nexus diminishes if probable cause exists based solely upon the behavior that the officer observed.

**Commonwealth v. Delvalle**, 74 A.3d 1081, 1085-86 (Pa. Super. 2013).

Viewing the totality of the circumstances, probable cause existed for the officers to stop and arrest Defendant, and a nexus was established between their experience and their observation. **Thompson** and **Dunlap** pertain to single hand-to-hand transactions. Here, the officers observed Defendant receive money from another individual, enter his vehicle, return to the individual, and hand over small objects. N.T. at 8-9. This sequence of events occurred twice in under ten minutes in the same exact manner. The second individual with whom Defendant engaged was stopped minutes later by police and two green flip-top containers of crack cocaine were found. N.T. at 9-10. When Defendant's vehicle was later searched pursuant to a valid search warrant, seventy-two green flip-top containers of crack cocaine were found, *inter alia*. N.T. at 13. Lancaster Avenue was a place where narcotics are regularly sold. N.T. at 14. Officer Outterbridge has been a police officer for

sixteen years with thirteen years in narcotics. N.T. at 15. He had training in terms of packaging, distribution, and surveillance techniques, and had conducted at least three or four surveillances of 4500 Lancaster Ave., the specific location where Defendant was observed. N.T. at 15-16. Those surveillances led to arrests. N.T. at 16. Officer Outterbridge testified that the drug trade in the city of Philadelphia is central to establishments that sell alcohol, Chinese stores, stop-and-go delis, and bodegas. N.T. at 17.

Relating that experience to the specific facts of the instant case, Officer Outterbridge testified that these types of establishments were present at location. *Id.* His testimony formed a nexus between his experience and the facts of the arrest. ***Dunlap***, 941 a.2d at 676. Given the nature and location of the transactions, and the frequency and repetitiveness of the transaction, we are unpersuaded by Defendant's argument that the lower court's finding that probable cause existed to arrest him was based entirely on Officer Outterbridge's years of experience as a police officer.

We are also not persuaded by Defendant's argument that because the lower court did not state its credibility determination on the record, that we cannot consider the testimony of Officer Outterbridge which Defendant claims contradicts Ms. Buchanan's testimony. Appellee's Br. at 11 ("The trial court made no credibility findings between Ms. Buchanan and Officer Outterbridge. The law is clear however, this Court is not at liberty to consider Officer Outterbridge's testimony where it is contradicted by that of Appellee's witness, Ms. Buchanan."). Defendant admits that the "trial court determined that

probable cause to arrest Appellee existed based on Officer Outterbridge's testimony describing his observations." Appellee's Br. at 9. Additionally, the trial court referred to Ms. Buchanan as Defendant's "second buyer." N.T. at 39. Thus, it is facially apparent that the trial court found Officer Outterbridge's testimony credible and found that Ms. Buchanan's testimony that she did not make a drug purchase not credible.

Nonetheless, the contradictions between the testimonies are not abundantly clear—while Ms. Buchanan denied purchasing narcotics from Defendant, the Officer's testimony is not that he definitively saw Defendant sell narcotics to Ms. Buchanan. He stated that he observed two transactions with Defendant and another of unidentified small objects in exchange for U.S. currency, and Ms. Buchanan never testified that she did *not* hand Defendant money or take any object. Thus, the officer's testimony of the interaction between Defendant and Ms. Buchanan stands uncontradicted, and in combination with the additional facts above, provides ample evidence for a finding of probable cause for arrest.

Next, we must address the issue at hand: if the evidence recovered from Defendant's vehicle after a valid search warrant was executed must nonetheless be suppressed because of the Officer's driving of Defendant's vehicle to the impound lot. The Commonwealth argues that it is reasonable for constitutional purposes for police to seize and hold a car until a search warrant can be obtained in circumstances such as this. Appellee's Br. at 10. Even if the police officer moving the vehicle was improper, the vehicle was not

searched during the relocation of the car and thus the evidence recovered could not be the fruit of any putative police conduct requiring suppression. *Id.* at 13. The Commonwealth cites **Commonwealth v. Holzer**, 389 A.2d 101 (Pa. Super. 1978), for the proposition that:

> It is reasonable, therefore, for constitutional purposes, for police to seize and hold a car until a search warrant can be obtained, where the seizure occurs after the user or owner has been placed into custody, where the vehicle is located on public property, and where there exists probable cause to believe that evidence of the commission of a crime will be obtained from the vehicle.

*Id.* at 106. The Commonwealth argues that here, Defendant was placed into custody, after the arrest his vehicle was still on a public street, and there was probable cause to believe evidence of the drug sales was in the vehicle, and thus the car was properly moved to a secure location until a search warrant was obtained. Appellant's Br. at 11-12; Appellant's Reply Br. at 6.

The trial court stated on the record at the conclusion of the suppression hearing, "There was a valid warrant which was executed. That valid warrant was executed after an illegal seizure. The question is whether the illegal seizure of the vehicle is grounds for suppression of the evidence." N.T. at 40. However, as it is our appellate duty in a suppression case, we must determine if the court below correctly applied the law to the facts. **Korn, supra.**

There is statutory authority for the seizure of vehicles at the direction of police:

> (c) Removal to garage or place of safety. — Any police officer may remove or cause to be removed to the place of business of the operator of a wrecker or to a nearby garage or other place of

safety any vehicle found upon a highway under any of the following circumstances:
(1) Report has been made that the vehicle has been stolen or taken without the consent of its owner.
(2) The person or persons in charge of the vehicle are physically unable to provide for the custody or removal of the vehicle.
(3) The person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay.
(4) The vehicle is in violation of section 3353 (relating to prohibitions in specified places) except for overtime parking.
(5) The vehicle has been abandoned as defined in this title. . . .

75 Pa.C.S. § 3352.

This statutory power is above the traditional caretaking function which allowed police to remove cars which presented some hazard to the public or impaired the movement of traffic. **Commonwealth v. Bailey**, 986 A.2d 860, 863 (Pa. Super. 2009).

Interestingly, despite the fact that this statute has been on the books since 1976, we have found only one that case has commented on section (c)(3), **Commonwealth v. Hennigan**, 2000 PA Super 145, 753 A2d. 245 (Pa. Super. 2000). In that case, the police impounding the car was improper because the suspect was not operating or in control of his car at the time of arrest. Rather, the car was simply legally parked on the side of the road. In dicta, **Hennigan** comments that the ability to impound a car is derived from the traditional care-taking function of the police which has allowed police to tow cars, prior to statute, in situations where the cars presented some manner of hazard to the public or where the car might impact on the movement of traffic.
We note, however, that the statute separately accounts for the traditional care-taking functions where the police have always been allowed to tow a vehicle. For example, section (c)(5) addresses abandoned vehicles. Section (c)(2) addresses situations where the person or persons in charge of the vehicle are incapable of providing custody or removal of the vehicle. Section (c)(4) directs attention to the traditional parking

situations where the vehicle might pose a hazard or impede the orderly flow of traffic.

Therefore, it appears that the legislature intended these situations to be viewed distinctly and separately.

*Bailey*, 986 A.2d at 863.

In *Commonwealth v. Germann*, 621 A.2d 589 (Pa. Super. 1993), police officers stopped a driver with a fraudulent inspection sticker on a vehicle in very poor condition. *Id.* at 592. Believing evidence of more fraudulent stickers would be found in the car, the officer searched the car and found two more fraudulent stickers, drugs paraphernalia, and cocaine. *Id.* at 591. The trial court held that there was independent probable cause for a search of the vehicle, and that the evidence would have been inevitably discovered through a search when the police moved the car pursuant to section 3352. On appeal, this Court found that the vehicle could not have been subject to removal by police pursuant to any enumerated subsection of section 3352 because the defendant would only have been issued a summary citation based on the exterior fraudulent stickers, so he still had the right to custody of his vehicle. *Id.* at 594.

Thus, in order to determine if the seizure of Defendant's vehicle was in fact illegal or if it was legally moved, we must determine if the facts of this case fall into any enumerated subsection of section 3352. Subsection (c)(3) states that a police officer may remove a vehicle to a place of safety if the person "in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay." 75 Pa.C.S. § 3352(c)(3). Here, the

- 11 -

record shows that Defendant was in control of the Dodge Ram from which he conducted transactions and later drove. N.T. at 9. Defendant was stopped and arrested without a warrant after a perceived violation of 35 P.S. § 780-113. Pursuant to Pa.R.Crim.P. 519, "when a defendant has been arrested without a warrant in a court case, a complaint shall be filed against the defendant and the defendant shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay." Pa.R.Crim.P. 519(A)(1). Thus, unlike the initial summary violation in *Germann*, Defendant's alleged offense is one "for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay." 75 Pa.C.S. § 3352(c)(3). Therefore, the requirements of section 3352 have been satisfied and the police had statutory authority to remove Defendant's vehicle to the impound lot.

The question remains if the fact that Officer Woltman personally entered Defendant's car to remove it to a secure facility while awaiting a search warrant instead of calling a towing service, was a violation of Defendant's constitutional rights. Section 3352 states that a police officer may "remove or cause to be removed" a vehicle. While the word "remove" is not defined, the plain language of the statue does not indicate the vehicle always needs to be towed even if that is the usual method of removal.

In *Commonwealth v. Williams*, 2 A.3d 611 (Pa. Super. 2010), a case discussed in each party's brief, after a defendant was placed under arrest on probable cause of narcotics dealing while exiting his vehicle outside his home,

a police officer drove the defendant's car from his private driveway to the police station. *Id.* at 615. The vehicle was not searched during the drive, but canines alerted the police of the presence of drugs upon the car's arrival at the police station. The car was fully searched after a valid warrant was executed. *Id.* at 617. Evidence of drugs, *inter alia*, was discovered. *Id.* at 615. There, citing **Commonwealth v. Holzer**, 389 A.2d 101 (Pa. Super. 1978), we said,

> Our Supreme Court concluded that the towing of the car was not improper, holding: "It is reasonable . . . for constitutional purposes for police to seize and hold a car until a search warrant can be obtained, where the seizure occurs after the user or owner has been placed into custody, where the vehicle is located on public property, and where there exists probable cause to believe that evidence of the commission of crime will be obtained from the vehicle." The Court also observed that if the "vehicle is located on the defendant's private property (garage or driveway), it becomes more difficult, although not impossible, to find the police conduct reasonable, since there has been a greater infringement upon defendant's expectations of privacy."

**Williams**, 2 A.3d at 618 (citations omitted). The issue then became if the removal of the vehicle from defendant's private property, as opposed to from a public location, was still reasonable. Thus, the issue was not the manner of removal—towing or driving.

To remedy the fact that the car was seized from private property, we engaged in an analysis of the independent source doctrine, as articulated in **Segura v. United States**, 468 U.S. 796, (1984), to determine if the evidence that was discovered "lawfully, and not as a direct or indirect result of illegal activity," was admissible. *Id.* at 618. We stated,

- 13 -

> The information supporting the canine sniff and the warrant was not derived to any extent from the singular act of taking [defendant's vehicle] from the driveway to the police station to secure it. Rather, those two searches were based upon facts learned prior to the act of transporting the vehicle. Thus, the independent source doctrine, as articulated in **Segura**, is directly applicable.

**Williams**, 2 A.3d at 620-21. Thus, it seems plain that we only engaged in the independent source analysis in **Williams** because the defendant's vehicle was seized from his private property without a warrant, not because it was removed by an officer driving it. This would defeat Defendant's argument that "the Commonwealth failed to present evidence . . . [to] establish an independent source." Appellee's Br. at 23-24. Nonetheless, here we will analyze if the evidence discovered in Defendant's vehicle pursuant to the valid search warrant had an independent source.

The "exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." **Wong Sun v. United States**, 371 U.S. 471, 485 (1963). The **Wong Sun** Court stated that the exclusionary rule does not prevent the introduction of evidence that is "gained from an independent source," but rather applies only to "knowledge gained by the Government's own wrong." **Id.** The Supreme Court further expounded on the concept of the independent source doctrine in **Segura v. United States**, 468 U.S. 796 (1984). In **Segura**,

> drug enforcement officers made an invalid warrantless entry into the defendant's apartment because there were no exigent

- 14 -

circumstances permitting such an entry. However, the drug agents did not conduct a search of the premises with the exception that they visually inspected each room solely to ensure that no one was present who posed a threat or would destroy evidence. The drug officers then secured the apartment in order to preserve the status quo while a search warrant was procured. Significantly, the drug enforcement officers did not seize any evidence, even that in plain view, until the warrant arrived. Additionally, the government did not use any information that was found due to the initial entry into the apartment to support issuance of the warrant.

The Supreme Court held that, even though the initial warrantless entry into the apartment was illegal, it did not taint the discovery of the evidence found and seized pursuant to the warrant. It reasoned that "the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry." *Id.* at 799. The Supreme Court concluded that suppression was unnecessary "because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, T.D. 2984, 17 Ohio L. Rep. 514 (1920)." *Id.* The Supreme Court noted that the evidence obtained as a result of the valid warrant did not result to any extent from the original, invalid entry.

*Williams*, 2 A.3d at 620.

Here, the trial court states multiple policy reasons for justifying suppression concerning Defendant's rights:

Despite appellee's arrest, he maintained a reasonable expectation of privacy along with an ownership interest in his vehicle. By entering and driving the appellee's vehicle, and using the gasoline which appellee purchased to fuel his vehicle all without a warrant, the police infringed upon appellee's property interests and his privacy rights.

Moreover, allowing the police to transport vehicles by driving them to various locations throughout the Commonwealth—as opposed to having the vehicle's towed—police could be operating unsafe vehicles on public roads and unwittingly

endangering motorists and pedestrians. Arresting officers should not be responsible for assessing the safety and roadworthiness of these vehicles. Certainly, motorists and pedestrians should not bear the risk of potentially dangerous vehicles being transported by the police from crime scenes to impound lots.

Tr. Ct. Op. at. 6.

Here, the facts supporting the valid search warrant were not derived to any extent from the act of Officer Woltman entering Defendant's vehicle to drive it to the secure lot or any impressions Officer Woltman made from within the vehicle. N.T. at 40. Instead, the facts supporting the search warrant included Officer Outterbridge's observations of Defendant's activities on Lancaster Ave. *Id.* Those facts were known to Officer Outterbridge before Officer Woltman's entry into Defendant's vehicle and thus need not have been suppressed as fruit of an illegal seizure. *Segura*, 468 U.S. at 799.

The trial court erred in failing to address that section 3352 gives statutory authority to police officers to remove a vehicle "to the place of business of the operator of a wrecker or to a nearby garage or other place of safety." 75 Pa.C.S. § 3352(a). Officers are not authorized to drive the vehicles of another to any "various locations throughout the Commonwealth" as the trial court suggests. Thus, since there was probable cause to arrest Defendant and for the officers to obtain a warrant to search his vehicle, the police had authority to remove the vehicle, and because the evidence recovered from the vehicle had an independent source, we reverse.

Order reversed.

Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: 3/13/2024