J-S04031-25                    2025 PA Super 104

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                               :            PENNSYLVANIA
                               :
              v.               :
                               :
                               :
                               :
NICHOLAS HOYLE                 :
                               :
              Appellant        :   No. 1370 EDA 2024

Appeal from the Judgment of Sentence Entered May 10, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0005081-2021

BEFORE: OLSON, J., STABILE, J., and FORD ELLIOTT, P.J.E.

OPINION BY FORD ELLIOTT, P.J.E.:                  **FILED MAY 16, 2025**

Appellant, Nicholas Hoyle, appeals from the judgment of sentence imposed by the Delaware County Court of Common Pleas after a bifurcated trial during which a jury found him guilty of third-degree murder, carrying a firearm without a license, and possessing an instrument of crime, and the trial court found him guilty of possession of a firearm by a prohibited person.[1] He challenges the denial of his pre-trial suppression motions, the denial of his pre-trial motion in *limine*, the omission of jury instructions on voluntary and involuntary manslaughter, and the discretionary aspects of his sentence. Upon review, we affirm.

_____

*Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 6106(a)(1), 907(a), and 6105(a)(1), respectively.

Just after 9:00 a.m. on October 4, 2021, Officer James McIntosh of the Collingdale Police Department was on patrol when he noticed a person laying at a trolley stop near the intersection of Woodlawn Avenue and MacDade Boulevard. *See* N.T. Trial, 9/27/23, 53-54. Upon investigating the person who was laying with his right arm over his face with his body halfway in a doorway, Officer McIntosh realized it was the deceased body of the victim in this case, Dwayne Williams. *Id.* 53-55. Officer McIntosh was familiar with Mr. Williams from "hundreds" of prior interactions, as Mr. Williams was someone frequently on MacDade Boulevard whom the police "deal[t] with very often." *Id.* at 57-58, 114. Officer McIntosh called for an ambulance and reported the discovery of the body to his supervisor, Corporal Patrick Crozier. *Id.* at 56. From the trolley station, the police recovered the victim's bicycle with a bag tied to its handlebars, which bag contained Bud Light seltzer drinks and an empty box for a cellular phone. *Id.* at 58-59, 64-65.

The victim's cause of death was a gunshot wound. *See* N.T. Trial, 9/27/23, 65-66, 145, 159. The bullet's projectile entered the victim's right shoulder, passed through his right lung, ribs, aorta, and diaphragm, and was recovered from his abdomen. *Id.* at 148, 152. After the police officers were informed of the cause of death, Officer McIntosh, Corporal Crozier, and members of the Delaware County Criminal Investigations Division returned to the trolley station the next day to canvas the area for evidence. *Id.* at 66-67, 206. In a grassy area behind the trolley station, they found two unfired live bullet rounds. *Id.* at 70, 77, 79-81, 180-81.

Corporal Crozier recovered surveillance videos recorded on the day of the murder from the businesses surrounding the area of the trolley station. *See* N.T. Trial, 9/27/23, 82, 206-07, 211. Among those businesses was a Wawa convenience store at 910 MacDade Boulevard. *Id.* at 83, 212. At around 12:21 a.m., a masked man wearing a distinctive black, white, and blue jacket, black jeans, and tan Timberland boots, entered the Wawa store, made a purchase, and exited the store. *Id.* at 84, 120; Trial Exhibit C-37, 0:17.



*See* Trial Exhibit C-37, 0:17 (surveillance video view of suspect walking into the Wawa store).



**See** Trial Exhibit C-37, 0:33 (surveillance video view of suspect completing the purchase in the Wawa store).

At 1:18 a.m., a man in the same black, white, and blue jacket is seen on a surveillance camera walking towards the trolley stop near Woodlawn Avenue and MacDade Boulevard. **See** N.T. Trial, 9/27/23, 85-86. The victim, Mr. Williams, can be seen sitting on a bench inside the trolley stop. **Id.** at 87. The masked man in the same distinctive jacket seen in the Wawa surveillance video sits down next to Mr. Williams. **Id.** The man in the distinctive jacket gets up, continues to pace around the trolley stop, walks out to MacDade Boulevard and the grassy area around behind the trolley stop, and then

returns to the trolley stop. *Id.* at 88, 209-10. At 1:31:02 a.m., the man in the distinctive jacket can be seen on the surveillance video with his arm raised and pointing in the direction of Mr. Williams, at which point Mr. Williams stood up, walked out to the trolley platform, and then collapsed in the doorway of the trolley stop where Officer McIntosh found him about eight hours later. *Id.* at 88-89, 92, 210. In a separate set of video footage from a black and white video feed, the flash of light from a muzzle of a gun can be seen at the end of the masked man's arm when the man in the distinctive jacket raised his arm in the direction of Mr. Williams. *Id.* at 91.



*See* Trial Exhibit C-37, 6:39 (surveillance camera view of the suspect to the left of the trolley stop doorway while the victim is sitting inside the station).



***See*** Trial Exhibit C-37, 9:18 (surveillance camera view of suspect leaning into the trolley stop doorway with his arm extended in the direction of the victim).



*See* Trial Exhibit C-37, 10:50 (alternate surveillance camera view of suspect leaning into the trolley stop doorway at which point a muzzle flashlight can be seen at the end of the suspect's extended arm).

At 1:31:10 a.m., the man in the distinctive jacket can be seen on the surveillance video running between the trolley stop and some signs near the grassy area behind the trolley stop, where the police recovered the two live rounds. *See* N.T. Trial, 9/27/23, 90. At 1:31:25 a.m., the man can be seen on the footage crossing MacDade Boulevard and proceeding down that roadway. *Id.*

After reviewing the surveillance videos and noticing that the suspected shooter and the customer in the Wawa store appeared to be wearing the same jacket, Corporal Crozier requested information from Wawa concerning the card used by the suspect to complete his purchase. *See* N.T. Trial, 9/27/23, 212-13. On the evening of October 5, 2021, Wawa emailed the requested transaction record to Corporal Crozier. *Id.* at 213. The record reflected that an Electronic Benefits Transfer ("EBT") card was used for the observed transaction for an energy drink and some candy at 12:21 a.m. on October 4th, and included the last four numbers for the identification number for the card. *Id.* at 214-15. Based on the information provided from Wawa, Corporal Crozier prepared a search warrant for the Pennsylvania Department of Public Welfare ("DPW") that was approved and served on the morning of October 6th. *Id.* at 214-17. In response to the search warrant, Corporal Crozier received Appellant's account benefits detail form from DPW, identifying his

name, his address, information about the transaction observed in the surveillance video at the Wawa store 12:21 a.m. on October 4th, and information concerning another transaction at a 7-Eleven store at 1307 Chester Pike at 1:38 a.m. on October 4th. *Id.* at 218, 220-21. Corporal Crozier subsequently obtained surveillance video footage for the transaction at the 7-Eleven store. *Id.* at 221-22.

The surveillance video from the 7-Eleven store showed Appellant in a black long sleeve shirt, black pants, and tan boots, walking into the store, at 1:36 a.m. on October 4th, carrying a black and blue jacket. *See* N.T. Trial, 9/27/23, 93, 107, 221, 224. Appellant asked an employee in the store for a bag and put the jacket in the bag before purchasing a beverage. *Id.* at 93-94. After reviewing the surveillance video from the 7-Eleven store and confirming Appellant's address, Corporal Crozier prepared a search warrant for the apartment where Appellant resided. *Id.* at 225.



*See* Trial Exhibit C-37, 18:17 (surveillance footage of Appellant walking into the 7-Eleven store).



*See* Trial C-37, 18:28 (surveillance footage of Appellant walking into the 7-Eleven store).

On October 6, 2021, Officer McIntosh and another officer conducted plain clothes surveillance in the area of the 400 block of Sharon Avenue near the apartment identified as the address for Appellant in the information received in response to the search warrant to DPW. *See* N.T. Trial, 9/27/23, 95-96, 220. The officers saw a white Nissan arrive at that location with Appellant as a passenger of the car. *Id.* at 98-99, 101. The officers removed Appellant from the vehicle and Officer McIntosh recovered a 32-caliber revolver from Appellant's hip waistband, in addition to recovering keys, a

cellular phone, and a wallet from his person.[2]  *Id.* at 99-100, 109-11, 113-14.  The police recovered the EBT card used for the observed transactions at the Wawa and 7-Eleven stores from Appellant's wallet.  *Id.* at 229-30.

The officers executed the search warrant at Appellant's apartment at 437 Sharon Avenue shortly after Appellant was taken into custody.  *See* N.T. Trial, 9/27/23, 100-01, 114, 227-29.  In the apartment, the officers recovered a pair of black jeans, a long sleeve black shirt, a watch, the distinctive blue, white, and black jacket, and a pair of tan Timberland boots.  *Id.* at 103, 107-09, 118-119.  The recovered watch, shirt, and boots appeared to match the watch, shirt, and boots worn by Appellant in the surveillance footage from the 7-Eleven store.  *Id.* at 108-09, 223, 225.  The recovered jacket matched the distinctive jacket worn by the shooter in the surveillance footage and the suspect making the purchase in the Wawa surveillance video.  *Id.* at 102, 119, 211, 213.  The recovered jacket was consistent with the jacket Appellant had folded up with him in the 7-Eleven surveillance video.  *Id.* at 223-24.  Within the apartment, the police found a package label addressed to Appellant at that address and a lease to the apartment reflecting that the apartment was leased by Appellant's brother.  *Id.* at 107-08.  The keys recovered from Appellant were for the door to the searched apartment, and Appellant's

_____

[2] Appellant did not have a valid license to carry a firearm.  *See* N.T. Trial, 9/27/23, 238.  He was prohibited from possessing a firearm due to a prior robbery conviction.  *See* N.T. Trial, 9/28/23, 67-69.

identification card in his wallet identified the searched apartment as Appellant's home address. *Id.* at 110.



*See* Trial Exhibit C-28-73 (photograph of the recovered jacket found in Appellant's apartment); N.T. Trial, 9/27/23, 108.

The firearm recovered from Appellant was an operable, Smith and Wesson 32-caliber revolver, manufactured by Iver Johnson. *See* N.T. Trial, 9/27/23, 183, 187. When it was recovered by the police, it was loaded with five live Smith and Wesson 32-caliber rounds that were manufactured by Winchester and were made of lead without any jackets. *Id.* at 112, 188. The gun had lands and grooves inside its barrel that were consistent with "five, right." *Id.* The two live rounds that the police recovered from the grassy

area behind the trolley station were stamped "Federal" for the manufacturer, and the caliber was 32 Smith and Wesson. *Id.* at 181. Each of the live rounds from the grassy area had an indentation on the corner of their primers possibly caused by the firing pin in a misfire. *Id.* at 182. The bullet specimen recovered from the victim's body was an uncoated, distorted, lead 32-caliber bullet. *Id.* at 189. The Commonwealth's firearms expert determined that the bullet specimen recovered from the victim's abdomen was discharged from the recovered revolver. *Id.* at 191.

The police executed search warrants for the phone recovered from Appellant and two Facebook accounts for Appellant. *See* N.T. Trial, 9/27/23, 230, 232. A Facebook post from October 3rd, collected as a result of the requests, included a photograph of Appellant wearing boots matching the ones recovered from his apartment. *Id.* at 233-34.

On January 23, 2023, Appellant filed a counseled motion to suppress: (1) records of DPW for the used EBT card, showing that it was issued to Appellant; (2) the clothing, boots, jacket, and jeans recovered from his residence; (3) the handgun, cellular phone, and other items recovered from his person; and (4) the contents of the seized cellular phone. Counseled Motion to Suppress, 1/23/23, 1-8; *see also* Defense Memorandum of Law, 3/3/23, 1-21. On March 10, 2023, Appellant filed a counseled motion in *limine*, a proposal for *voir dire* questions, and a pre-trial statement requesting a jury instruction on voluntary manslaughter. *See* Counseled Pre-Trial Statement, 3/10/23, ¶ 4. In the counseled motion in *limine*, Appellant

addressed the admissibility of a notice from the Pennsylvania Board of Probation and Parole that was recovered from his home upon the execution of a search warrant and photographs taken during the victim's autopsy. **See** Counseled Motion in *Limine*, 3/10/23, 1-4. After a hearing was held on the suppression motion on February 14, 2023, the trial court denied Appellant's pre-trial motions on March 17, 2023. **See** Order (pre-trial motions), 3/17/23 1.

Appellant subsequently filed a *pro se* motion seeking to waive counsel and proceed *pro se* pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998), and a *pro se* motion to suppress evidence recovered from his person and the contents of his cellular phone. **See** *Pro Se* Motion for Change of Appointed Counsel, 7/27/23, 1; *Pro Se* Pre-Trial Motions, 8/14/23, 1-4. The trial court presided over a hearing on August 28, 2023, at which it granted Appellant's motion to proceed *pro se,* ordered appointed counsel to serve as standby counsel for trial, and denied Appellant's *pro se* suppression motion. **See** Waiver of Counsel Form, 8/29/23, 1; Order (*pro se* motion for change of appointed counsel), 8/30/23, 1; Order (*pro se* pre-trial motion), 8/30/23, 1.

On September 5, 2023, Appellant filed a *pro se* motion for discovery. **See** *Pro Se* Motion for Discovery, 9/5/23, 1-5. On September 7, 2023, he filed *pro se* motions seeking a continuance of the scheduled trial date and a request for an amendment to the trial court's August 30, 2023 order denying his *pro se* pre-trial motions. **See** *Pro Se* Motion for Continuance, 9/7/23, 1-2; *Pro Se* Motion for Amendment of Interlocutory Order, 9/7/23, 1-5. The

- 13 -

trial court presided over a hearing on those motions on September 18, 2023. *See* Order (*pro se* motion for discovery), 9/21/23, 1. The court denied the discovery motion, granted Appellant's then-oral motion to withdraw his prior waiver of counsel, and reappointed standby counsel as trial counsel. *Id.*

On September 22, 2023, Appellant filed a counseled motion in *limine*, including the two claims from his former counseled motion in *limine*, concerning the admissibility of the recovered Pennsylvania Board of Probation and Parole notice and the autopsy photographs, and a new claim seeking the admission of expert testimony from a forensic toxicologist concerning the testing of blood and urine samples extracted from the victim during his autopsy. *See* Counseled Motion in *Limine*, 9/22/23, 1-5.

Appellant proceeded to be tried on September 27-28, 2023. The Commonwealth presented testimony of Officer James McIntosh, the medical examiner who performed the autopsy on the victim (Doctor Khalil Wardak), the victim's sister (Pamela Kay), a firearms expert (Detective Louis Grandizio), and the police officer who conducted the murder investigation (Corporal Patrick Crozier). The exhibits marked and moved into the record included, *inter alia*, a compilation of the surveillance videos from the Wawa store, cameras near the trolley station, and the 7-Eleven store. *See* N.T. Trial, 9/27/23, 82; N.T. Trial, 9/28/23, 8. Appellant did not present any witnesses. *See* N.T. Trial, 9/28/23, 8. After reviewing the evidence, the jury and the

court found Appellant guilty of the above-referenced offenses.[3] **See** Jury Verdict Sheet, 9/28/23, 1-2; Trial Court Verdict Sheet, 9/28/23, 1; N.T. Trial, 9/28/23, 68-69. Sentencing was deferred for the preparation of pre-sentence investigation report and psychological evaluations. **See** N.T. Trial, 9/28/23, 69; Pre-sentence Investigation Order, 9/28/23, 1.

On January 29, 2024, the trial court sentenced Appellant to an aggregate imprisonment term of thirty-two years and four months to sixty-four years and eight months, consisting of consecutive imprisonment terms of twenty to forty years for third-degree murder, seven years and six months to fifteen years for possession of a firearm by a prohibited person, three years and six months to seven years for carrying a firearm without a license, and sixteen to thirty-two months for possessing an instrument of crime.[4] **See** Order (sentencing), 1/29/24, 1; N.T. Sentencing Hearing, 1/29/24, 46.

---

[3] The jury also found Appellant not guilty of first-degree murder. **See** Jury Verdict Sheet, 9/28/23, 1.

[4] In its sentencing order, the trial court incorrectly calculated the aggregate sentence as "not less than 32.25 years and not more than 64.5 years," but those decimal approximations amount to thirty-two years and three months to sixty-four years and six months' imprisonment where the total sum of the consecutive imprisonment terms added up to thirty-two years and four months to sixty-four months and eight months. **See** Order (sentencing), 1/29/24, 1; N.T. Sentencing Hearing, 1/29/24, 46-48.

On February 2, 2024, Appellant, through his trial counsel, filed a timely post-sentence motion.[5]  On February 5, 2024, trial counsel filed a motion to withdraw from representation of Appellant.  *See* Motion to Withdraw as Counsel, 2/5/24, 1-2.  On February 21, 2024, the trial court appointed present counsel "for post-sentence proceedings and for any appellate proceedings." *See* Order (motion to withdraw as counsel), 2/21/24, 1.  Present counsel thereafter filed a supplemental post-sentence motion wherein Appellant requested: (1) credit for time served from October 6, 2021, and January 29, 2024; (2) "a reduction of the aggregate (total) sentence because it was … unduly harsh and punitive;" and (3) a new trial because the jury was not instructed on the lesser included offenses of voluntary and involuntary manslaughter (*i.e.*, the prior request for a voluntary manslaughter instruction should have been granted and the trial court should have *sua sponte* instructed the jury on involuntary manslaughter based on the evidence presented at trial).  *See* Counseled Supplemental Post-Sentence Motion, 3/12/24, 4-7.  Based on both post-sentence motions, the trial court granted reconsideration and ordered a hearing.  *See* Order (post-sentence motions), 3/12/24, 1.

---

[5] A proposed order for this motion appears in the record certified for this appeal, but the record lacks a copy of the motion itself.  In any event, the trial court characterized it as a motion for "reconsideration and modification of sentence" in its responsive order.  Order (post-sentence motions), 5/9/24, 1.

The trial court heard arguments from counsel on the post-sentence motions on May 2, 2024. On May 10, 2024, the trial court: (1) denied the initial post-sentence motion for reconsideration and modification of sentence; (2) partially granted relief on the supplemental post-sentence motion to the extent that it requested a grant of a credit for time served; (3) denied the remaining claims in the supplemental post-sentence motion; and (4) corrected a clerical error on its "sentence certificate" so a notation on the sentencing order indicating that the sentence for count 6 should be served "consecutive to Ct. 6" would be changed to "consecutive to Ct. 5." *See* Order (post-sentence motions), 5/10/24, 1-2.

Appellant timely filed a notice of appeal and a court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[6] *See* Rule 1925(b) Statement, 6/21/24, 1-2; Order (Rule 1925(b)), 6/18/24, 1; Notice of Appeal, 5/15/24, 1. Appellant also filed a request to file a supplemental Rule 1925(b) statement with an attached certification from counsel, identifying an additional question for the trial court's Rule 1925(a) opinion. *See* Counseled Motion to Supplement Rule 1925(b) Statement,

_____

[6] Appellant's notice of appeal indicated that this appeal is from "the judgment of conviction and sentence that were re-affirmed in the attached Order[,] dated May 9, 2024." Notice of Appeal, 5/15/24, 1. We have updated the caption and docket for this appeal to reflect that the appeal lies from the amended/corrected judgment of sentence entered on May 10, 2024. *See Commonwealth v. Garzone*, 993 A.2d 1245, 1254 n.6 (Pa. Super. 2010) (where the trial court amends the judgment of sentence during the period it maintains jurisdiction, the direct appeal lies from the amended judgment of sentence).

7/2/24, 1; Counseled Certification in Support of Motion to Supplement Rule 1925(b) Statement, 7/2/24, 1-2.

Appellant presents the following questions for our review:

I.     Whether [A]ppellant was unlawfully stopped and searched requiring the suppression of any evidence seized as a result of the warrantless seizure[?]

II.    Whether there is a reasonable expectation of privacy in an EBT card number and whether the records of the [DPW] were improperly obtained by the Commonwealth[?]

III.   Whether the decedent's toxicology results should have been admitted at trial[?]

IV.    Whether the jury should have been instructed on voluntary manslaughter and involuntary manslaughter[?]

V.     Whether the aggregate sentence imposed on 388 months to 776 months['] imprisonment was unduly disproportionate, excessive, harsh, and punitive[?]

Appellant's Brief, 5.

In his first two issues, Appellant presents discrete challenges to the denial of his pre-trial motions to suppress evidence. In the first issue, he claims the suppression court erred by denying his motion to suppress the items that the police recovered from his person. *See* Appellant's Brief, 13-15. In the second issue, Appellant claims that the suppression court erred by denying his motion to suppress the evidence that the police obtained from DPW concerning his EBT card. *See* Appellant's Brief, 16-19. For these issues,

> our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the

> legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Singleton*, 169 A.3d 79, 82 (Pa. Super. 2017) (citations omitted). Moreover, "[w]ith respect to the suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part[,] or none of the evidence presented[.]" *Commonwealth v. Easter*, 331 A.3d 675, 679 (Pa. Super. 2025) (citation omitted).

In the first issue, Appellant asserts that he was unlawfully stopped for merely being a suspect in a felony investigation, and the items seized from him at the time of his arrest, including the recovered gun, wallet, and cellular phone, should have been suppressed as the fruits of an illegal stop. *See* Appellant's Brief, 15. He also asserts that his arrest was unlawful because it occurred prior to the issuance of an arrest warrant. *Id.* We disagree.

As an initial matter, Appellant waived his argument that the stop and search incident upon his arrest was unlawful for the lack of the prior issuance of an arrest warrant because he did not preserve that theory for suppression before the suppression court. *See Commonwealth v. Little*, 903 A.2d 1269, 1272-73 (Pa. Super. 2006) ("appellate review of an order denying suppression

- 19 -

is limited to examination of the precise basis under which suppression initially was sought; no new theories for relief may be considered on appeal."); Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). When Appellant sought the suppression of the items recovered from his person below, he asserted that the police lacked probable cause to arrest him. *See* Appellant's Pre-Trial Motions, 1/23/23, ¶ 25. In his post-suppression hearing brief, he asserted: "As the arrest of the Defendant was based upon name and address information obtained from [DPW], the arrest was unlawful. When an officer makes an unlawful arrest, any evidence seized during a search incident to the arrest must be suppressed." Appellant's Memorandum of Law, 3/3/23, 14. In both filings, Appellant did not adequately preserve his present theory that the items should be suppressed for lack of an arrest warrant, and thus that portion of his appellate claim is waived.

Appellant also argues that he was improperly arrested as a mere suspect prior to the execution of a search warrant as occurred in ***Commonwealth v. Melendez***, 676 A.2d 226 (Pa. 1996). *See* Appellant's Brief, 13-14. To the contrary, the officers had probable cause to believe Appellant had killed the victim at the time they stopped, arrested, and searched him. ***See***, ***generally***, ***Commonwealth v. Dixon***, 997 A.2d 368, 380 (Pa. Super. 2010) (*en banc*) (warrantless arrest is lawful where officers have probable cause to believe the arrestee had committed a crime).

"To determine whether probable cause exists to justify a warrantless arrest, we must consider the totality of the circumstances." **Commonwealth v. Clark**, 735 A.2d 1248, 1252 (Pa. 1999). Probable cause for a warrantless arrest exists when "the facts and circumstances within the knowledge of the arresting officer are reasonably trustworthy and sufficient to justify a person of reasonable caution in believing that the arrestee has committed an offense." **Commonwealth v. Floyd**, 313 A.3d 1061, 1065 (Pa. Super. 2024) (citation omitted).

Here, we find no error with the suppression court's conclusion that the police had probable cause to believe that Appellant had committed the murder of Dwayne Williams at the time they arrested him and conducted a lawful search of his person incident to the arrest. **See** Trial Court Opinion, 9/18/24, 9. Prior to the arrest, the police collected the surveillance videos showing the fatal shooting committed by the masked man in the distinctive colored jacket, the purchase made at the Wawa shortly before the shooting by the masked man in the same jacket and attire as the shooter, and Appellant making the purchase at the 7-Eleven store while carrying a jacket with matching colors as the jacket worn by the shooter and the observed customer at the Wawa store. **See** N.T. Suppression Hearing, 2/14/23, 19-39, 47-52. While the face of the shooter and the customer at the Wawa store could not be seen on the surveillance videos, the police also confirmed prior to the arrest that the purchases made by Appellant at the 7-Eleven store and the masked customer at the Wawa store who matched the shooter were both transacted with the

same EBT card associated with Appellant. *Id.* at 39-47, 75-77. Moreover, Appellant could be seen in the 7-Eleven store surveillance video wearing boots and dark jeans similar to the boots and jeans worn by the customer at the Wawa store. *Id.* at 54. In these circumstances, it was reasonable to conclude that Appellant was likely the shooter from the trolley stop station, and thus, there was probable cause for the arrest.[7] ***See Commonwealth v. Thompson***, 985 A.2d 928, 931 (Pa. 2009) (noting that probable cause requires only a probability, and not a *prima facie* showing, of criminal activity).

Appellant argues that he was unlawfully stopped because the police did not observe him engage in any criminal activity "either moments before or at the time he was stopped in a car near his apartment." Appellant's Brief, 15. In making this assertion, he fails to appreciate that active engagement in a crime was not a prerequisite for a warrantless arrest so long as the police had probable cause for a completed felony that he committed. ***See Commonwealth v. Evans***, 685 A.2d 535, 537 (Pa. 1996) ("probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an

---

[7] Even if Appellant had preserved the part of his appellate claim concerning the absence of an arrest warrant, that argument would be meritless so long as the police had the necessary probable cause to commit a warrantless arrest of him, and the existence of necessary probable cause for arrest was undoubtedly established below. ***See Commonwealth v. Clark***, 735 A.2d 1248, 1247 (Pa. 1999) ("[L]aw enforcement authorities must have a warrant to arrest an individual in a public place unless they have probable cause to believe that 1) a felony has been committed; and 2) the person to be arrested is the felon.").

offense **has been** or is being committed") (citation omitted; emphasis added). Accordingly, we conclude his first issue on appeal warrants no relief.

In his second issue, Appellant claims that the trial court erred by denying his motion to suppress the information that the police obtained from DPW to connect him to the EBT card used at the Wawa and the 7-Eleven stores. **See** Appellant's Brief, 16-19. He agrees that DPW was permitted to disclose information of a welfare recipient whose account it administers so long as a law enforcement officer already has the recipient's name. **Id.** at 16. With respect to his case, however, he alleges that his privacy rights in the information he had provided to DPW were violated and that the police improperly obtained the full account number for his EBT card from Wawa without a grand jury subpoena or a search warrant. **Id.** at 17-18. He also alleges that suppression was warranted because the police included a misstatement of fact in its search warrant served on DPW: the affidavit of probable cause to the search warrant indicated that the receipt that the police initially received from Wawa had his full 19-digit EBT account number, rather than a truncated listing of only the last four digits of the account number, when, at the time the affiant drafted the affidavit, the affiant only had the last four-digit combination. **Id.** at 18-19.

At the suppression hearing, Corporal Crozier testified that, after he reviewed the surveillance videos, he reached out to Wawa to obtain information about the transaction completed by the suspected shooter. **See** N.T. Suppression Hearing, 2/14/23, 39. At that point, Wawa provided him

with a transaction record that included the last four digits of the account number for the EBT card used in the observed transaction. *Id.* In the responsive email he received from Wawa, the sender indicated that "she had reached out to the credit processor and that [Wawa w]ould have the full card number" by the next morning, October 6, 2021. *Id.* at 39-40.

While awaiting the receipt of the full account number, Corporal Crozier started to prepare the search warrant for DPW. *See* N.T. Suppression Hearing, 2/14/23, 41. On the morning of October 6th, Christine Andrews from Wawa Corporation called Detective David Tyler and provided him with the full 19-digit account number for the used EBT card. *Id.* at 75-77. After speaking with Ms. Andrews, Detective Tyler sent the full account number to Corporal Crozier via a text message. *Id.* at 77. Corporal Crozier then included the full account number in the affidavit of probable cause for the search warrant that he then served on DPW. *Id.* at 44-45. The passage in the affidavit of probable cause that refers to the full account number included the following:

> The same Wawa representative was contacted again to obtain credit card information. Your affiant received an email back with an image attached. This image was a copy of a receipt for a 20[-]ounce Body Armor drink and a bag of Gummy Bears. The time stamp on the receipt is 12:21 and the card swiped is/was an EBT card. The receipt noted the EBT card number was 60076030012544397.

Affidavit of Probable Cause for DPW Search Warrant, 10/6/21, 2 (marked and moved into the record as exhibit C-4 at the suppression hearing), *see* N.T. Suppression Hearing, 2/14/23, 44, 92.

- 24 -

In reviewing this claim, the suppression court concluded that Appellant could not meet his initial pleading burden of demonstrating a reasonable expectation of privacy in the identifying information associated with his EBT card. **See** Trial Court Opinion, 9/18/24, 10. The court reached this conclusion by interpreting the following administrative code provision as expressly stating that all branches of law enforcement would have access to the information from DPW's program recipients:

**§ 105.4. Procedures.**

…

(c) *Release of information to law enforcement officials.* For applicants and recipients of TANF and GA cash assistance, the Department will comply with the following:

(1) Provide to a Federal, State or local law enforcement officer the address of a fugitive felon, parole or probation violator or an individual who may have information that the officer needs to conduct official duties if the location and apprehension of the recipient is within the official duties.

(2) Exchange information with the Pennsylvania State Police and the Board of Probation and Parole to identify individuals who have been sentenced for a felony or misdemeanor and have not satisfied the penalty imposed by law to ensure that cash assistance is not granted to those individuals. The Pennsylvania State Police and Board of Probation and Parole will have access to the records of the Department's Assistance Recipient Identification Program (finger-imaging file).

**Id.** at 10-11 (quoting 55 Pa Code § 105.4(c)(1)-(2). In addition to concluding that 55 Pa. Code § 105.4 mandated DPW to allow the police access to information concerning the EBT card, the court reasoned that Appellant had

no reasonable expectation of privacy in his information associated with his EBT card because he knowingly exposed the information related to the card to the public "by allowing businesses, such as Wawa, to collect that information during transactions." *Id.* at 11. To the extent that the affidavit of probable cause provided that the police recovered the full EBT card account number from the initial receipt sent from Wawa rather than through Detective Tyler's phone conversation with Ms. Andrews, the suppression court found that there was "no deliberate, material misstatement of fact in the search warrant application." Findings of Fact and Conclusions of Law, 12/28/23, 46.

We must first address the finding of a lack of a reasonable expectation of privacy because it is axiomatic that a defendant seeking suppression must demonstrate a reasonable expectation of privacy that was violated. *See Commonwealth v. Millner*, 888 A.2d 680, 692 (Pa. 2005) ("[A] defendant cannot prevail upon a suppression motion unless he demonstrates that the challenged police conduct violated his own, personal privacy interests."). While the Commonwealth has the burden of going forward with evidence and of establishing at the suppression hearing that the challenged evidence was not obtained in violation of the defendant's rights, "the defendant still must meet a burden of persuasion that his or her expectation of privacy was violated." *Commonwealth v. Enimpah*, 62 A.3d 1028, 1032 (Pa. Super. 2013).

A reasonable expectation of privacy will be found to exist when the defendant "exhibits an actual or subjective expectation of privacy and that

- 26 -

expectation is one that society is prepared to recognize as reasonable." *Commonwealth v. Kane*, 210 A.3d 324, 330 (Pa. Super. 2019). In determining whether a defendant's expectation of privacy is legitimate or reasonable, "we must consider the totality of the circumstances and the determination ultimately rests upon a balancing of the societal interest involved." *Id.* (citation and quotation marks omitted). "The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances." *Id.*

Here, we find no error with respect to the suppression court's conclusion that the Appellant had no reasonable expectation of privacy in the full account number for his EBT card where he used the EBT card bearing his name and full account number to conduct the observed transaction at the Wawa store. Under the "third-party doctrine," a person who reveals his affairs to another has taken the risk that the information would be conveyed by that person to the government. *See United States v. Miller*, 425 U.S. 435, 443 (1976). In *Miller*, the defendant sought to suppress bank documents on the theory that they were illegally seized. *Id.* at 439. The Supreme Court held that the bank records were actually business records of the bank in which Miller could "assert neither ownership nor possession." *Id.* at 440. Further, the Supreme Court found that the records, in the possession of a third party, could not be deemed exclusively private to Miller as they were "exposed to [bank] employees in the ordinary course of business." *Id.* at 442. In *Miller* and

related cases, the United States Supreme Court has "consistently … held that a person has no legitimate expectation of privacy in information that he voluntarily turns over to third parties." **Smith v. Mayland**, 442 U.S. 735, 743-44 (1979) (collecting cases including **Miller** applying the "third party doctrine").  The doctrine applies "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." **Miller**, 425 U.S. at 443.

In the instant case, the third-party doctrine would provide that Appellant had no reasonable expectation of privacy with respect to the information turned over by Wawa to the police because he willingly shared that information with Wawa as a third party, even if it was for the limited purpose of purchasing an energy drink and candy and with the assumption that Wawa would not share the information.  The Fourth Amendment does not protect the information on cards, such as on Appellant's EBT card or credit, debit, and gift cards that are "routinely read by private parties at gas stations, restaurants, and grocery stores." **U.S. v. Bah**, 794 F.3d 617, 631 (6th Cir. 2015); **see also United States v. Turner**, 839 F.3d 429, 436 (5th Cir. 2016) ("[S]ociety does not recognize as reasonable an expectation of privacy in the information encoded in a gift card's magnetic stripe."); **United States v. Briere de L'Isle**, 825 F.3d 426, 432 (8th Cir. 2016) ("[T]he purpose of a credit, debit or gift card is to enable the holder of the card to make purchases, and to accomplish this, the holder must transfer information from the card to the seller, which negates an expressed privacy interest."); **United States v.**

*Alabi*, 943 F. Supp. 2d 1201, 1285 (D.N.M. 2013) (holding the disclosure of electronic information on credit and debit cards "does not infringe on any person's right to be 'secure' in his or her person" and thus "the balance weighs heavily in favor of the utility of law enforcement").

The notion that Wawa's act of sharing the information with the police was lawful, because Appellant had shared it with the convenience store for the purpose of completing his transaction via the EBT card, is also consistent with Pennsylvania law. For instance, in *Commonwealth v. Duncan*, 817 A.2d 455 (Pa. 2003), our Supreme Court held that a warrantless telephone call police made to a defendant's bank – much like the police interactions with Wawa in this case – which sought the name and address information associated with an Automatic Teller Machine card of a person suspected of rape, did not violate the suspect's rights under Article 1, Section 8 of the Pennsylvania Constitution. *See id.* at 462 ("We hold, consistently with the realities of our modern, consumer age and the experience of other courts, that [Duncan] does not have an expectation of privacy in his name and address that society is willing to recognize as reasonable and legitimate."). More recently, this Court held that a defendant did not have a reasonable expectation of privacy in a pharmacy database logging his purchases of over-the-counter medicines where the police searched the database for his logged purchases without obtaining a search warrant or a court order. *See Commonwealth v. McFarland*, 278 A.3d 369, 380 (Pa. Super. 2022). Under the third-party doctrine and the decisions in *Duncan* and *McFarland*,

Appellant had no basis for arguing for a reasonable expectation of privacy in the information that he provided to Wawa and that Wawa in turn provided to the police.

Our review next turns to Appellant's assertions about the propriety of DPW's response to the police search warrant. The trial court held that Appellant had no reasonable expectation of privacy in the information turned over to the police by DPW because, pursuant to 55 Pa. Code § 105.4(c)(1), "the Public Welfare Department must allow branches of law enforcement to have access to the information of Welfare program recipients." Trial Court Opinion, 9/18/24, 11.

Appellant disagrees with the suppression court's reading of that administrative code provision because he alleges that the provision "assumes the law enforcement officer already has the recipient's name" at the time of the information request. Appellant's Brief, 16. In support of that assertion, he cites a federal regulation which requires state agencies, upon implementing EBT systems, to ensure that the EBT systems are capable of performing the function of, *inter alia*, "[e]nsuring the privacy of household data and providing benefit and data security." **Id.** (citing 7 CFR Part 274.8(a)(1)(ix)).

Pursuant to 55 Pa. Code § 105.1(d), the Pennsylvania Department of Human Services safeguards the following information with respect to public assistance applicants and recipients:

(1)   The names of applicants and recipients.

(2)    The address of any applicant or recipient and the amount of assistance any recipient is receiving except as provided in § 105.4.

(3)    Information in applications, reports of investigations, financial and medical records, correspondence and other recorded or unrecorded information, related to the condition or circumstances of applicants and recipients.  This applies to information in the offices of the Department, the Department of the Auditor General, the Treasury Department and other agencies concerned with the administration of public assistance.  Information that does not identify a particular individual is not included in the class of material to be safeguarded.

55 Pa. Code § 105.1(d)(1)-(3).  Section 105.4, referenced in Section 105.1(d)(2), states in relevant part:

(c) *Release of information to law enforcement officials.*  For applicants and recipients of TANF and GA cash assistance, the Department will comply with the following:

(1)    Provide to a Federal, State or local law enforcement officer the address of a fugitive felon, parole or probation violator or an individual who may have information that the officer needs to conduct official duties if the location and apprehension of the recipient is within the official duties.

55 Pa. Code § 105.4(c)(1).

Based on the above sections, Appellant believes that his name, as a public assistance recipient, had to be safeguarded by DPW with no exception and that the police had no right to seek the name associated with his EBT card because Section 105.4(c)(1) does not refer to the disclosure of a name of a recipient and instead only refers to the disclosure of an address.  Appellant's

reading of this section is consistent with DPW's Supplemental Nutrition Assistance Program ("SNAP") handbook which provides:

> The [county assistance office] must give a federal, state, or local law enforcement officer the address, Social Security number, and photograph (if available) of any household member if the officer **has the person's name** and:
>
> - The person is fleeing to avoid prosecution, custody or confinement after a felony conviction or attempted or attempted felony; …

Pa. Dep't Pub. Welfare, SNAP Handbook § 503.42 (emphasis added) (available at http://services.dpw.state.pa.us/oimpolicymanuals/snap/503_General_Information/503_4_Disclosure.htm).

After our review, we conclude that, although Appellant's interpretation of Section 105.4(c)(1) may be generally correct, it is unavailing and inapplicable under the present circumstances. DPW's disclosure of Appellant's name was not procured by some informal written request of a local law enforcement agency pursuant to Section 105.4(c)(1), but rather pursuant to a search warrant approved by a magisterial district judge. Accordingly, the request was made under Section 105.4(b)(3) which provides: "(3) *Judicial order (subpoena)*. Information may be disclosed on proper judicial order." 55 Pa. Code § 105.4(b)(3); *cf. Commonwealth v. Melilli*, 555 A.2d 1254, 1258-59 (Pa. 1989) (holding that a "judicial order authorizing the installation of pen registers [under the Wiretap Act] is the equivalent of a search warrant in its operative effect … [and] the affidavit and order must comply with the

requirements of probable cause"). Therefore, to the extent that a qualified privilege for Appellant's name is presumed under Section 105.4(c)(1), it does not extend to judicial orders under Section 105.4(b)(3). Because the police requested the name associated with Appellant's EBT card account number through a judicially approved search warrant, consistent with Section 105.4(b)(3), we find no basis for concluding that suppression should have been granted under Section 105.4(c)(1).

Equally unavailing is Appellant's assertion that he "gave personal information to [DPW] for the limited purpose of receiving SNAP benefits in the form of an EBT card with the expectation that neither [DPW] nor any entity (such as Wawa) processing [DPW] program benefits would disclose his personal information … which would lead to the disclosure of such information without proper judicial process." Appellant's Brief, 17. Here, the use of a judicially approved search warrant constituted "the proper judicial process."[8]

_____

[8] The United States District Court for the Eastern District of Pennsylvania reached this same conclusion in response to civil claims that Appellant raised pursuant to 42 U.S.C. § 1983:

> Because the DPW records were obtained pursuant to a warrant, it is irrelevant whether Hoyle had a reasonable expectation of privacy in them. Further, "there is no recognized privilege for DPW records" in this Circuit that would have justified [the employee of DPW records] refusing to respond to a facially valid warrant.

*Hoyle v. Crozier*, 2024 WL 169571, *8 (E.D.Pa., filed Jan. 16, 2024) (footnotes omitted).

*See In re Grand Jury Subpoena Dated Nov. 14, 1989*, 728 F.Supp. 368, 372 (W.D.Pa. 1990) ("DPW considers the state statute and regulations to establish a privilege which prevents disclosure of general assistance records, ***absent a court order***.") (emphasis added) (citing 55 Pa. Code § 105.4(b)(3)); ***see also id.*** at 374 (holding that Pennsylvania DPW and, indirectly, its client, enjoy a privilege, one which is not absolute, under federal law with respect to information which the client submits to DPW).  We hold that a search warrant approved by a magisterial district judge was a judicial order for purposes of 55 Pa. Code § 105.4(b)(3).[9]

_____

[9] As Appellant only argues that there was an improper application of Section 105.4(c)(1), and fails to appreciate that the approved search warrant fell within the ambit of a Section 105.4(b)(3) request, he does not reach the issue of whether the magisterial district court had sufficient grounds to grant the search warrant.

We note that there is a clear absence of Pennsylvania law on the application of Section 105.4(b)(3) in general, let alone in the context of judicial orders relating to the disclosure of information for governmental assistance recipients for the purpose of advancing criminal investigations.  At the same time, we appreciate that the United States District Court for the Western District of Pennsylvania has adopted the following standard for disclosure requests such as the one in the instant case:

> The court will set aside the privilege [of confidentiality of public assistance records] if the United States submits an affidavit stating: 1) it has reasonable cause to believe a federal crime has been committed; 2) the information sought is probative of a matter at issue in the prosecution of the crime; and 3) the same information or equally probative information cannot be obtained elsewhere through reasonable efforts.

*(Footnote Continued Next Page)*

Upon concluding that Appellant did not have a reasonable expectation of privacy that was violated by Wawa's disclosure of his EBT card account number and that the DPW did not improperly disclose his identity as the account holder for the EBT card, we lastly address his assertion that misstatements in the affidavit of probable cause for the DPW search warrant invalidated the warrant itself. Appellant asserts that the police included false information in its affidavit by alleging that the full 19-digit account number was included in the transaction record that Wawa initially provided to Corporal Crozier. Instead, the full account number was provided to Detective Tyler a day after the receipt of the transaction record and then communicated to Corporal Crozier, who included the full account number in the search warrant in a manner implying it had been sourced from the transaction record. *See* Appellant's Brief, 18. Appellant asserts that the affidavit thus included

_____

*In re Grand Jury*, 728 F. Supp. at 374. The purpose of this standard is to accommodate "both the public policy of the state in maintaining confidentiality of public assistance records, and the public policy for the effective and fair prosecution of federal crimes." *Id.* While the District Court in *In re Grand Jury* found the affidavit in that case was inadequate to "overcome the qualified privilege," it noted that "if the public assistance records contained the only available information to resolving a federal crime, the balance might tip in favor of the Government's interest in detecting and punishing criminal activity." *Id.*

If we were to apply the *In re Grand Jury* standard here, the facts and circumstances would warrant DPW's disclosure of Appellant's name because, based on the evidentiary record from the suppression hearing, DPW's records contained the only available information necessary for resolving the state crimes in connection with the murder of Mr. Williams.

"materially false information" that rendered the resulting search warrant defective and mandated suppression. *Id.* at 19.

To succeed on this part of his claim, Appellant had to show that the police made deliberate false statements or made statements with a reckless disregard for the truth in the affidavit of probable cause:

> In *Franks v. Delaware*, [438 U.S. 153, 171 (1978)], the United States Supreme Court held that a defendant may attack the validity of a warrant on the basis that it contained untruthful information. A defendant attacking a warrant on this basis must allege that the warrant contained statements "of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.*
>
> We applied *Franks* in *Commonwealth v. Gomolekoff*, 910 A.2d 710, 715 (Pa.[ ]Super. 2006). There, police obtained a search warrant for the defendant's home, based on two emails. When officers executed the search, they seized four computer towers. However, the two emails were not found on the towers. The defendant insisted the warrant was therefore invalid and he was entitled to suppression. We cited the *Franks* rule regarding challenges to warrants based on the inclusion of false information. We concluded the defendant's argument lacked merit because he had failed to proffer any evidence that the affiant of the warrant had "made deliberately false statements, or made statements with a reckless disregard for the truth." *Id.*

*Commonwealth v. Adorno*, 291 A.3d 412, 417 (Pa. Super. 2023). Moreover, he would need to show that the misstatements at issue involved material facts in the case. *See Commonwealth v. Clark*, 602 A.2d 1323, 1325 (Pa. Super. 1992) ("if a search warrant is based on an affidavit containing deliberate or knowing misstatement of material fact, the search

warrant is invalid"). "A material fact is one without which probable cause to search would not exist." *Id.* at 1326 (citation omitted).

Upon reviewing the suppression hearing testimony of Corporal Crozier and Detective Tyler, we are unable to conclude that the assertion about the transaction report containing the full EBT account number in the affidavit of probable cause was a deliberate misstatement about a material fact that invalidated the DPW search warrant. We have already concluded that the police lawfully received the full account number from Wawa and the use of the account number did not violate Appellant's constitutional rights. There was no proffer before the suppression court to suggest that Corporal Crozier omitted the additional involvement of Detective Tyler's phone communication with Wawa in the effort to uncover the full account number as a deliberate attempt to make false statements or with a reckless disregard for the truth to the issuing authority for the DPW search warrant. The alleged deliberate misstatement at issue did not cover up for a lack of probable cause for the search warrant and the facts presented below reflected that the circumstances of the receipt of the full account number, along with the video surveillance in this case, supported the necessary probable cause for the search warrant. If the subsequent phone call with the Wawa representative had been accurately recited in the affidavit, there would still have been probable cause. Accordingly, the misstatement was not material, and the suppression court properly denied suppression with respect to this subpart of his claim. Accordingly, Appellant is not entitled to relief on his second claim on appeal.

In his third issue, Appellant claims that the trial court erred by denying his motion in *limine* in which he sought the admission at trial of toxicology results and related expert testimony to show that the victim had a substantial amount of methamphetamine in his blood and urine at the time of the shooting. **See** Appellant's Brief, 19-22. He asserts that this evidence was admissible to demonstrate that victim was the aggressor for the purposes of presenting a self-defense theory at trial. **See** Appellant's Brief, 19-20.

> Our standard of review for this claim is well established:
>
> When ruling on a trial court's decision to grant or deny a motion in *limine*, we apply an evidentiary abuse of discretion standard. A trial court has broad discretion to determine whether evidence is admissible, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Belani*, 101 A.3d 1156, 1160 (Pa. Super. 2014) (citations and quotation marks omitted).

The trial court denied the motion in *limine* because it found the proposed toxicology/expert evidence to be irrelevant where the surveillance video evidence did not support a self-defense theory. **See** Trial Court Opinion, 9/18/24, 12-13. In his motion, Appellant asserted that the video footage had showed the victim "apparently unprovoked, rise from the seat on a bench and quickly advance towards the assailant, just prior to having been shot." Motions in *Limine*, 9/22/23, ¶ 19. He asserted that the toxicology evidence for the victim and related expert testimony would "explain the conduct of the

decedent" consistent with his version of the events demonstrated in the surveillance footage. *Id.* The trial court, upon reviewing the surveillance video evidence, disagreed that it showed that the victim acted in accordance with what Appellant had alleged in his motion in *limine*. *See* Trial Court Opinion, 9/18/24, 12.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence to the determining the action. *See* Pa.R.E. 401(a)-(b). Here, our review of the surveillance video compilation, admitted at trial as exhibit C-37, shows that the victim was seated on the bench in the MacDade Boulevard trolley stop station during the entire portion of the events recorded at the station prior to the shooting. *See* Trial Exhibit C-37, 3:51-9:18. The victim only stood up from the bench upon appearing to be shot at 1:31:02 a.m., at which point he collapsed in the doorway of the trolley station. *Id.* at 9:18-9:27. Rather than as alleged in Appellant's motion in *limine*, the video showed that the shooting was a cold, callous, unprovoked assassination that was accomplished when Appellant leaned into the doorway of the trolley station with his arm extended holding a firearm to shoot the seated victim. Because the events in the video did not offer any support to the notion that the victim acted as the aggressor prior to the shooting, we agree with the trial court that the evidence concerning the victim's toxicology results was inadmissible as irrelevant because it did not make it more or less likely that Appellant shot the victim as

an act of self-defense. Accordingly, Appellant is not entitled to relief on his third issue on appeal.

In his fourth issue, Appellant asserts that the trial court should have instructed the jury on voluntary manslaughter and involuntary manslaughter as lesser included offenses of his first- and third-degree murder charges and that a new trial should be granted based on a lack of instructions on those lesser included offenses. *See* Appellant's Brief, 22-25. He argues that a voluntary manslaughter instruction should have been given because there was a "quantum" of evidence from the surveillance video footage "to show the decedent had suddenly approached the alleged perpetrator who in response fired the fatal shot." *Id.* at 24. With respect to involuntary manslaughter, he argues that an instruction for that type of charge should have been given because there was some "quantum" of evidence justifying an instruction where "the decedent was only shot a single time in the shoulder area without any evidence of close[-]range firing." *Id.* 24-25. He acknowledges that he requested a voluntary manslaughter instruction below, but he admits that it is unclear from the certified record whether he ever requested an involuntary manslaughter instruction. *Id.* at 24 n.8. He nevertheless argues that the trial court should have *sua sponte* instructed the jury on involuntary manslaughter because of the "disputed evidence presented at trial" and the fact that the Commonwealth withdrew an involuntary manslaughter charge at the preliminary hearing. *Id.*

We initially note that the Commonwealth argues this claim is waived for lack of preservation. Appellee's Brief, 24 n.6. With respect to waiver of jury instruction error claims on direct review, our Supreme Court has stated:

A general exception to the charge to the jury will not preserve an issue for an appeal. Specific exception shall be taken to the language or omission complained of. Pa.R.A.P. 302(b). Additionally, […] in the criminal trial context, the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points.

*Commonwealth v. Sanchez*, 82 A.3d 943, 978 (Pa. 2013) (citation omitted). *See Commonwealth v. Pressley*, 887 A.2d 220, 224 (2005) (holding that "[t]he pertinent rules [of Criminal Procedure]… require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction"); Pa.R.Crim.P. 647(C) ("No portion of the charge ***nor omissions*** from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. All such objections shall be made beyond the hearing of the jury.") (emphasis added).

At trial, the parties alerted the trial court, after the conclusion of its charge to the jury, that its instructions had omitted reference to a concealment element for the offense of carrying a firearm without a license, which the court immediately cured with a new instruction on that offense. ***See*** N.T. Trial, 9/28/23, 62-65. During the brief conference on the instruction for the

firearms offense and until the jury was left to deliberate, Appellant did not raise any objections to the lack of instructions on lesser included offenses, let alone specifically object to the lack of voluntary and involuntary manslaughter charges. Even if Appellant had earlier requested a manslaughter instruction in his pretrial motions, Rule 647(C) and our case law required him to raise a specific objection before the jury retired to deliberate. Having failed to raise any objections about the omission of manslaughter instructions at the conclusion of the court's charge, Appellant waived his instant trial court error claim. *See* Pa.R.Crim.P. 647(B); Pa.R.A.P. 302(b).

Despite the instant claim appearing to be waived for a lack of a specific objection concerning the absence of manslaughter instructions appearing of record, we note that our Supreme Court has recognized that a jury instruction issue can be preserved not only at the conclusion of a jury charge, but also during a charging conference. *See Sanchez*, *supra*, 82 A.3d at 978-79; *Commonwealth v. Green*, 273 A.3d 1080, 1084 n.2 (Pa. Super. 2022). Out of an abundance of caution, we will review the substantive merits of the instant claim because the Commonwealth acknowledges that the proceedings from the charging conference in this matter were not transcribed for the certified record in this appeal. *See* Appellee's Brief, 24 n.6.

We have previously noted that a

> trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. Instructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury.

*Commonwealth v. Patton*, 936 A.2d 1170, 1176 (Pa. Super. 2007) (citation and ellipses omitted); *see also Commonwealth v. Hairston*, 84 A.3d 657, 668 (Pa. 2014) ("[I]nstructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict.") (citation omitted). Accordingly, "a homicide defendant is entitled to a charge on involuntary or voluntary manslaughter only if the evidence adduced at trial would reasonably support a verdict on such a charge." *Commonwealth v. Soltis*, 687 A.2d 1139, 1141 (Pa. Super. 1996).

A voluntary manslaughter instruction is warranted where "the evidence would … demonstrate that, at the time of the killing, [the a]ppellant acted under a sudden and intense passion resulting from serious provocation by the victim." *Commonwealth v. Johnson*, 42 A.3d 1017, 1036 (Pa. 2012) (citation omitted), *see also* 18 Pa.C.S. § 2503(a). "If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." *Id.* (citation omitted).

Alternatively, "unreasonable belief voluntary manslaughter," sometimes referred to as "imperfect self-defense," will only justify a voluntary manslaughter instruction in limited circumstances: where a defendant held "an unreasonable rather than a reasonable belief that deadly force was required to save his or her life," and "all other principles of justification under

18 Pa.C.S. § 505 have been met." ***Commonwealth v. Green***, 273 A.3d 1080, 1088-89 (Pa. Super. 2022) (citation omitted); ***see also*** 18 Pa.C.S. § 2503(b). Generally, the use of deadly force is not justifiable "unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping[,] or sexual intercourse compelled by force or threat." 18 Pa.C.S. § 505(b)(2). Although a defendant has no burden to prove a claim of self-defense before such a defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124 n.13 (Pa. 2012).

A jury instruction on involuntary manslaughter is warranted when the evidence adduced at trial supports a finding that the defendant caused the death of another person "as a direct result of doing an unlawful act in a reckless or grossly negligent manner[.]" 18 Pa.C.S. § 2504(a). A person acts "recklessly" when he "consciously disregards a substantial and justifiable risk" that a material element of the offense exists or will result from his conduct, and the disregard of the risk "involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa.C.S. § 302(b)(3). A person acts "negligently" when he "should be aware of a substantial and unjustifiable risk" caused by his actions but fails to perceive it, and the failure "involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." 18 Pa.C.S. § 302(b)(4).

With respect to hypothetical manslaughter instructions, the trial court advises us that the evidence would not have supported instructions either for voluntary or involuntary manslaughter. With respect to a voluntary manslaughter instruction, the court notes that there was "absolutely no evidence presented or argued that [Appellant] was acting under a 'sudden and intense passion' or that 'general principles of justification' would apply to [Appellant's] unprovoked shooting of the victim." Trial Court Opinion, 9/18/24, 15. As for an involuntary manslaughter instruction, the court points out that such an instruction would have been inappropriate because Appellant argued to the jury that he was not the perpetrator of the shooting. *Id.* at 17 ("Defendant cannot argue he is not the perpetrator and argue for an instruction for involuntary manslaughter.").

We agree with the trial court's merits analysis. A voluntary manslaughter instruction would have been inappropriate because the video surveillance did not support heat of passion or imperfect self-defense theories where it showed that Appellant intentionally shot the seated, unarmed victim without any apparent conflict between the shooter and the victim or provocation on the part of the victim. *See Commonwealth v. Cash*, 137 A.3d 1262, 1272 (Pa. 2016) (holding that a trial court did not err by not giving a voluntary manslaughter instruction where surveillance video evidence showed that Cash deliberately approached his victim from behind and shot him in the back of the head, evincing that Cash acted with malice and specific intent to kill). Moreover, the intentional nature of the shooing in this case, as

demonstrated by the surveillance footage, would not have supported a basis for an involuntary manslaughter instruction. ***Cf. Commonwealth v. Fletcher***, 986 A.2d 759, 791 (Pa. 2009) (holding that a defendant's counsel was not ineffective for failing to request an involuntary manslaughter instruction where the record established that the defendant intentionally killed his victim by walking up to the victim, slapping him, and shooting the victim as the victim attempted to walk away from the defendant).

The trial court also correctly reasons that instructions on either type of manslaughter would have been inappropriate because Appellant's theory for his defense was that he was not the shooter. ***See Sanchez***, ***supra***, 82 A.3d at 980 ("This Court has long held that no jury charge is required on elements of voluntary manslaughter where the defendant denies having committed the killing."); ***Commonwealth v. Freeman***, 865 A.2d 894, 917 (Pa. Super. 2004) (co-defendant in prosecution for second-degree murder was not entitled to instruction on involuntary manslaughter where his defense was denial of the commission of any any acts that could have resulted in the victim's death); ***see also*** N.T. Trial, 9/28/23, 10 (Appellant's counsel during closing argument remarking that the jury "couldn't tell from the video footage that [they] saw that [Appellant] was in fact responsible" for the shooting of the victim). Even assuming *arguendo* that Appellant preserved this instruction claim by raising it during the charging conference, the trial court appropriately denied it for lack of merit. Accordingly, Appellant is not entitled to any relief on his fourth issue on appeal.

In his last issue, Appellant challenges the discretionary aspects of his sentence. In particular, he alleges that his aggregate imprisonment sentence of 388 to 776 months is "unduly harsh, manifestly excessive, and/or not otherwise appropriate under the Sentencing Code." Appellant's Brief, 26.

As an initial matter, we observe that challenges to the discretionary aspects of a sentencing do not entitle an appellant to an appeal as a matter of right. *See Commonwealth v. Anderson*, 830 A.2d 1013, 1017 (Pa. Super. 2003). Before we can reach the substantive merits of a discretionary sentencing issue:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[ ]§ 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006) (internal citations omitted).

When appealing the discretionary aspects of a sentence, an appellant must invoke the appellate court's jurisdiction by, *inter alia*, including in his brief a separate concise statement demonstrating that there is a substantial question as to the appropriateness of the sentence under the Sentencing Code. *See Commonwealth v. Mouzon*, 812 A.2d 617, 621-22 (Pa. 2002); Pa.R.A.P. 2119(f). "The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Anderson*, *supra*, 830

A.2d at 1013. A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. Brown**, 741 A.2d 726, 735 (Pa. Super. 1999) (*en banc*).

Instantly, Appellant did not include the requisite Rule 2119(f) statement in his appellate brief. The Commonwealth objects to this deficiency. **See** Appellee's Brief, 31 ("This claim is unreviewable because [Appellant] failed to provide the requisite Rule 2119(f) statement."). Accordingly, Appellant's failure to include the Rule 2119(f) statement renders his sentencing challenge waived on appeal. **See Commonwealth v. Griffin**, 149 A.3d 349, 353-54 (Pa. Super. 2016) (stating if appellant fails to include Rule 2119(f) statement in appellate brief and Commonwealth objects, appellant has waived discretionary aspects of sentencing challenge).

Having concluded that the trial court properly denied Appellant's motions to suppress and his motion in *limine*, his claim concerning the lack of manslaughter instructions is both waived and meritless, and his discretionary sentencing claim is unreviewable for the lack of a Rule 2119(f) statement, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/16/2025